JAMES EDWARD JONES, Respondent, v. THE ST. LOUIS, NAPLES AND PEORIA PACKET COMPANY, Appellant.

**St. Louis Court of Appeals, January 27, 1891.**

1. **Master and Servant: APPARENT DEFECTS.** *Held* (ROMBAUER, P. J., *dissenting*) that a servant suing for injuries resulting from the use of a defective appliance furnished by the master will not be debarred from a recovery by reason of the fact that the defect

was obvious, unless the danger of the use of the appliance was so glaring that there could be no fair debate as to whether a prudent man, situated as the plaintiff was and under the same circumstances, would have assumed the risk.   And all of the judges concurred in holding that the master was liable in such case if he assured the servant that the appliance could be safely used and ordered the servant to use it.

2.   ———— :   APPLIANCE  DEFECTIVELY  CONSTRUCTED  BY  FELLOW-SERVANT :  INSTRUCTIONS.   The mere fact that an appliance, furnished by the master to his servants and causing injury to one of their number, has been constructed by one who is a fellow-servant of the one injured, will not exonerate the master from liability for the consequences of a defectiveness of the appliance.   But where the master employs competent workmen, and provides suitable materials for the necessary staging to be used by them, and intrusts the duty of erecting it to them as a part of the work which they are engaged to perform, he is not liable to one of them for injuries resulting from the falling of the staging.

3.   ———— : ———— : INSTRUCTIONS.   The failure of the court to embody the latter limitation in its instructions, when not asked in proper form, amounts merely to non-direction, and is, therefore, not ground for the reversal of a judgment in favor of the servant.

4.   ———— : LIABILITY OF MASTER FOR TORTS OF SERVANT.   A master is not liable for every act which a servant may do while acting about the master's business.   The act must not only be done while the servant is employed about the business of the master, but it must also pertain to the duties of the employment.   And *held* that, where the second mate of a boat engaged in inland navigation used violence for the purpose of compelling a deck-hand to work, and the deck-hand did work under such compulsion, the master would not be liable for the wrong done, in the absence of evidence of the delegation of such authority to the mate.

*Appeal from the St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.

REVERSED AND REMANDED.

*D. P. Dyer*, for appellant.

*William C. Marshall*, for respondent.

THOMPSON, J.—The petition in this case is as fol-lows :   " Plaintiff states that the defendant is, and at all times hereinafter mentioned was, a corporation

organized under the laws of the state of Illinois; that heretofore, to-wit, on Saturday, May 19, 1888, plaintiff entered into the employ of defendant as deck-hand on its steamer Calhoun, then plying between St. Louis and Peoria; that thereafter, to-wit, on May 22, between the hours of twelve and one o'clock A. M., plaintiff, while in the discharge of his said duties, and while carrying coal onto said boat and storing the same in the coalbin, and while walking upon what was called a box gangway, which consisted of boxes with planks placed upon the tops thereof, which had been constructed by defendant on said boat for the purpose of enabling the deck-hands to dump coal into the said bin, and wholly without fault or negligence of plaintiff, was violently thrown head foremost into said coalbin, and the box of coal which plaintiff was carrying was thrown upon plaintiff, catching his left hand, and mangling, wounding and bruising the same, so that the middle finger thereof had to be amputated; that said box gangway was in a defective and dangerous condition, which was well known to defendant and unknown to plaintiff; that it was not a suitable, safe or proper kind of a gangway for the purposes for which it was used; that said accident to plaintiff was occasioned by said gangway giving way, turning over and said supports becoming detached, from not being in any manner fastened together; that, in consequence of the premises, and, owing to the carelessness and negligence of defendant, plaintiff was sorely and grievously injured, and has suffered great pain of body and mind, and has been unable to attend to his usual business or to earn a livelihood, and has been permanently injured and damaged. Wherefore plaintiff prays judgment against defendant in the sum of $5,000 and costs.

"And for a further and separate cause of action, plaintiff states that, being so employed by defendant in manner and form aforesaid, and after receiving the injuries hereinbefore mentioned, defendant compelled

plaintiff to continue to work on said boat and to carry sacks of wheat, and that, while so engaged, defendant, by and through its officers and agents, without any cause, excuse or justification whatever, assaulted plaintiff with great force and violence, and, with strong hands and with clubs, sticks and other weapons to plaintiff unknown, beat, bruised and wounded plaintiff upon his body, to-wit, on his back, on his side and on his ribs, at the same time cursing and abusing plaintiff, and mocking him for having a broken finger, as hereinbefore specified ; that in consequence of which plaintiff suffered great physical and mental pain. Wherefore plaintiff prays judgment in the sum of $5,000 and costs.''

The answer was a general denial, and a plea of contributory negligence. There was a trial before a jury, and a verdict and judgment in favor of the plaintiff in the sum of $1,500 on the first count, and $500 on the second count.

The plaintiff gave evidence tending to show that the defendent was, at the time spoken of, a corporation, owning and operating a steamboat, which plied between St. Louis, in Missouri, and Peoria, in Illinois, on the waters of the Mississippi and the Illinois rivers ; that the plaintiff was employed as a deck-hand or a "roustabout" on the said steamer ; that the roustabouts were under the command of an officer of the defendant known as the second mate ; that it was their duty, while so under his command to load the boat with the coal necessary to be consumed on its voyage ; that, for the purpose of holding the coal necessary to be taken on board, there was a large coalbin constructed upon the boiler deck, raised above the deck from three to four feet in height ; that, in order conveniently to lift the boxes of coal over the top of this bin so as to empty them therein, a structure had been made by the second mate, by placing three empty coalboxes end

to end along the side of the large coalbin, by placing a fifteen-inch plank upon the top of these three empty coal boxes, and then by placing one end of another plank upon the structure so raised, while the other end rested upon the deck of the boat. The coals were brought on board the steamer in large boxes, each containing about four bushels. Each of these boxes had two handles, and one man held one at each end. The plaintiff's evidence also tended to show that the plank, which was thus placed as a gang-plank for the hands to walk up with their loads of coal, was defective in this, that the part resting upon the deck was slivered or broken off diagonally, so that, while the plank was perhaps a foot wide, not more than seven inches of it rested upon the deck. The plaintiff gave evidence, that he called the attention of the second mate to the defect in the plank and the danger which might follow from using it, but the latter, with a curse, told him that it was not dangerous and ordered him to go ahead and use it. The plaintiff's evidence was further to the effect, that, while he was upon the plank so using it in the course of his duty, it turned over in consequence of the defect mentioned, whereby he was precipitated upon the coal in the bin, and hurt his hand in such a manner, that one of his fingers had to be amputated, and that he sustained damages of so serious a character, that the award of the jury on the first count is not complained of as excessive.

On the other hand, the defendant's evidence was to the effect that the person, called by the plaintiff's witness the second mate, was not an officer of the boat, but was merely a stevedore, and that the structure used by the men in loading the coal was erected not by this stevedore, but by another deck-hand named Russell.

Under the second count the plaintiff gave evidence to the effect that, after he had received the hurt and while his hand was bleeding and swollen, and while

the captain and first mate were off watch, and the boat was in the entire charge of the second mate, the latter compelled him to work with his injured hand, and also beat him for the purpose of making him work, and cursed him and used brutal language toward him. There was no evidence as to what the precise duties of this second mate were, and no evidence tending to show any express authority on the part of the defendant to him to use force or violence in compelling the deck-hands to do their work.

On this state of the evidence the court instructed the jury upon the first count as follows : "If the jury believe from the evidence that, in May, 1888, the plaintiff was in the employ of the defendant as a deck-hand on its steamer, the Calhoun, and that the plaintiff was engaged in carrying coal onto the boat and putting it into the bin, and that the officers of the defendant had caused a gang-plank to be constructed on the boat, by placing coalboxes on top of each other with a plank on the top of the same, and then placing a plank from the top of the coalboxes to the deck of the boat, so as to have the deck-hands walk up the plank to dump the coal in the coalbin, and if said plank or gangway so constructed was negligently constructed in a dangerous or unsafe manner, and was not, as constructed, a proper and safe appliance for the purpose it was used for ; and if the defendant or its officers knew the condition of said gang-plank, and if the plaintiff was injured by the giving away, or falling, or breaking of said gang-plank by reason of the dangerous or unsafe manner of its construction, and was not guilty of any negligence himself which directly contributed to the happening of the injury, then the jury should find for the plaintiff on the first count of the petition."

The court also submitted the issues under the second count to the jury in the following instruction: "If the jury believe from the evidence that, on or about

the twenty-second of May, 1888, plaintiff was in the employ of the defendant as a deck-hand on its steamboat, the Calhoun ; and that, while so employed, plaintiff's hand was injured and hurt ; and that plaintiff, after his hand was hurt as aforesaid, objected to continuing to work on said boat, and that the mate of said boat, while on duty as such mate, and while he was in control and command of the deck-hands of said boat, and while the captain of said boat was not present, and while said mate was engaged in directing said deck-hands in the loading of said boat, compelled plaintiff to work and labor in the loading of said boat, against his will and objection ; and that said mate, while on duty and engaged as aforesaid, for the purpose of compelling plaintiff, against his will and objection, to work and labor in loading said boat, struck and beat plaintiff with a stick or club with force and violence, then the jury should find for plaintiff on the second count of the petition."

The defendant requested, and the court refused, the following instruction : "Although you may believe from the evidence that the ·gangway was unsafe and insufficient, and that in consequence thereof the plaintiff's finger was injured, yet, if you believe from the evidence that such gangway was constructed by fellow-servants of the plaintiff ( that is servants engaged in the same kind of work as the plaintiff ), then the plaintiff is not entitled to recover on the first count of his petition, and you will return a verdict for the defendant on that count."

I.   The first assignment of error is, that the court should have given an instruction requested by the defendant to the effect that, under the pleadings and the evidence, the plaintiff was not entitled to recover. This court is of opinion that this error is not well assigned. It is predicated upon the ground that the defect in the plank, which, according to the plaintiff's evidence, caused the injury, was an obvious defect, and

that the plaintiff saw it and could judge of the likeli-
hood of its hurting him as well as anyone else.   Con-
ceding this to be the fact, a majority of the court
nevertheless hold, upon the authority of decisions of
the supreme court reviewed in the recent case of *Fugler
v. Bothe, ante,* p. 44, that this would not authorize
the court to take the case from the jury.   The fact that
the defect is an obvious one would not, in the opin-
ion of a majority of the court, authorize such a ruling,
unless the danger of the defect was so glaring and
obvious that there could be no fair debate about the
question, whether a prudent man would assume the
risk under the circumstances and situated as the plain-
tiff was.   Judge ROMBAUER does not concur in this
view for the reason stated in his dissenting opinion in
the case of *Fugler v. Bothe.*  But all the members of
the court are of the opinion that if, as the plaintiff tes-
tifies, he called the attention of the second mate to the
defect in the plank, and the latter assured him that it
could be safely used, and ordered him to go ahead, it
cannot be said as matter of law, that he was guilty of
contributory negligence in going ahead, or that he
accepted the risks of injury from the defect in so
doing (*McGowan v. Railroad,* 61 Mo. 528; *Stephens
v. Railroad,* 86 Mo. 221; *Rowland v. Railroad,* 20 Mo.
App. 463; *Keegan v. Kavanaugh,* 62 Mo. 230); the
danger, under the evidence, not being so obvious that it
can be said as matter of law, that it would be reckless
or foolhardy in the servant to rely upon the assurance
of his superior, and to obey his orders (*McDermott v.
Railroad,* 87 Mo. 285), and there being evidence author-
izing the conclusion that the second mate was a superior
officer—the *alter ego* of the master within the meaning
of this rule, and not a mere fellow-servant.

II.   The next assignment of error presents more
difficulty, but we have concluded that it must be
resolved against the defendant.  It is that the court
erred in refusing the defendant's instructions above set

out, and that the court committed an analogous error in giving, without qualification, the instruction given for the plaintiff—that is to say, in giving the plaintiff's instruction without a qualification embracing the principle contained in the defendant's request for instruction. The defendant's instruction, as drawn, is not correct in point of law, and would have tended to confuse and mislead the jury, rather than to enlighten them in their deliberations. It is not the law that the mere fact, that an appliance furnished by the master to his servants to be used by them in the prosecution of their work, has been constructed by one who is a fellow-servant engaged in the same kind of work with the servant who is injured, exonerates the master from liability for the consequences of a defectiveness of the appliance. On the contrary, the law is that the duty of the master to furnish reasonably safe tools, machines and appliances to his servants, to be used by them in the prosecution of the work assigned to them, is absolute in its nature and personal to the master, to the extent of using due care to accomplish the end named. As this duty is personal to the master, it is entirely immaterial to what grade of servants or employes he delegates its performance. He may delegate it to his general agent, who has the general superintendence of his work and the duty of employing and discharging hands, and the entire control over their movements and operations ; or he may delegate it to one of the common laborers who are to use the appliance. He may delegate it to a trained mechanic, or he may select a laborer utterly without skill. In either case, as the duty is personal to him, he becomes responsible for its proper performance to the extent of using reasonable care and diligence to the end that it is properly performed. In any of these cases the particular agent, employe or servant, to whom he delegates this duty, becomes, for that reason, and as to it, his vice-principal, and is taken out of the category of fellow-servants in

respect of any other servants who are injured through the defectiveness of the appliance. It is true, as has been reasoned by our supreme court in a recent case, that, where the master employs competent workmen, and provides suitable materials for the necessary staging to be used by them, and intrusts the duty of erecting it to them as a part of the work which they are engaged to perform, he is not liable to one of them for injuries resulting to him from the falling of the staging. The negligence in such a case is said to resolve itself into the negligence of a fellow-servant, and the principle has been applied under a variety of circumstances. *Bowen v. Railroad*, 95 Mo. 268, 277, and cases cited. If the defendant's instruction, which the court refused, had been aptly framed, so as to present to the minds of the jury this principle, it would have been error to refuse it. But as it was not correct in point of law, as framed, it was not error to refuse it.

It remains to inquire whether the defendant is entitled to complain of the failure of the court to embody a similar principle in its instruction given under the first count at the request of the plaintiff. It is plain that the failure of the court to do this was mere non-direction, and that the case comes within the principle that mere non-direction is no ground of reversing a judgment in a civil case. If the learned counsel for the defendant could not frame an instruction upon this hypothesis which was good in point of law, the court cannot be put in the wrong for failing to do it of its own motion.

III. The third and last assignment of error raises the question, whether there was any case to go to the jury under the second count, and the further question whether the court correctly submitted the issues under that count to the jury. We are of opinion that there was no case to go to the jury under the second count. The general rule is that the master is not liable for the wilful and criminal acts of his servants. *McKeon v.*

*Railroad*, 42 Mo. 79.   An exception to the rule is that, if the act is from its nature within the scope of the servant's employment, the master may be liable, although, in doing the act, the servant may have committed such an excess of his authority as to amount to wilfulness or criminality.   Thus, the conductor of a railway train has general authority to remove from the train persons who have no right to be there; but where, in the exercise of this general power, he removes from the train a person who is rightfully there and who has the right to remain there, the company is liable for the resulting damages. And where, in the exercise of the same authority, he removes from the train a person who has no right to remain there, but removes him with the use of excessive force, the company is likewise liable for damages for the excessive force; and this, although the excess may have been so great as to amount to wantonness or even criminality.

The case of *Schmidt v. Adams*, 18 Mo. App. 432, which has been cited to us on behalf of the plaintiff, is perhaps as good an illustration of this principle as any. In that case the defendant instructed his son, who thereby became for the purpose his servant, to drive the plaintiff's cattle out of and away from the defendant's field.   In executing this order, the defendant's son worried the plaintiff's cattle with dogs, and it was held that, for this excess of force, the plaintiff could recover damages from the defendant.   But here, the very act which the defendant ordered his son to do implied the use of the necessary force to accomplish it; and, as the court justly observes, the injury committed consisted in the use of unnecessary or unlawful force. We do not question the soundness of the reasoning of the court, as applied to the fact of that case, which was that, where the servant commits an injury while engaged in serving his master, and in carrying out his master's purpose, "the master will be responsible, whether the wrong be occasioned by negligence or by a wanton or

reckless purpose to accomplish the master's business in an unlawful manner."

We also lay out of view a class of cases, where the master is held liable for the wanton, malicious or even criminal act of his servant, where the act is not done within the scope of the servant's employment. Such is the case where the master has assumed a duty to the person injured, or where a duty to the person injured has been cast upon the master by operation of law by reason of the employment in which the master is engaged, which duty he undertakes to perform through a particular servant, and where the act of the servant, from its very nature, is a violation of that duty. A common illustration of this is the case where a railway conductor commits a wanton and malicious assault upon a passenger to accomplish some purpose of his own. Here, the railroad company has engaged to carry the passengers safely and without violence or molestation from its own servants, and the same duty has been cast upon it by operation of the law by reason of its employment as a public carrier. This duty from its very nature, when assumed by a corporation, can only be performed by agents or servants; and, when these agents or servants do an act toward the passenger, which from its very nature is a violation of this duty, then, upon plain grounds, the master is liable. Such was the case where the supreme court of Wisconsin held a railway company liable in damages for the act of a conductor in kissing a female passenger. *Craker v. Railroad*, 36 Wis. 657.

Neither do we concur in so much of the reasoning of the learned counsel for the appellant as places the liability of the defendant, if any, on the theory of an *implied authority* to his vice-principal to do the particular act complained of. The doctrine of *respondeat superior* does not rest upon any such basis. If it did, there could seldom be any liability in a case of a master who is a natural person, and never in the case of one

who is a corporation ; for an implied authority to commit wrongs could seldom be indulged in the case of a natural person, and never in the case of a corporation. It would result, in the case of a corporation, that it could not be liable for *tort*, because the commission of *tort* is *ultra vires*. There were some feeble and ill-considered conceptions of this sort in the earlier stages of jurisprudence in England and in this country, and even in this state ; but they have all been brushed away. The rule of *respondeat superior* is a rule, which identifies the servant with the master, while the servant is acting in the business of the master and in the accomplishment of the purposes of the master. Under the operation of the rule, the case is exactly the same, as though the act complained of had been committed by the master in person. That the rule rests upon this ground of public policy, and not upon an implied authority to do the particular act, is shown by that numerous class of cases which hold that the master may be liable, where the act was done by the servant in the scope of his employment, and to accomplish the purposes of that employment, although it was done contrary to the express orders of the master. *Garretzen v. Duenckel*, 50 Mo. 104. It is a familiar principle in the law of contracts, that there can be no implied contract contrary to the express agreement of the parties. So here, upon same principle, the law would not imply an authority to do the particular act contrary to the express command of the master to the servant not to do it,—which proves that the rule does not rest upon any theory of implied authority.

But it does not follow from this that every act which a servant may do, while acting about the business of his master, is one for which the master will be liable. Something more is required. The act must not only be done while the servant is employed about the business of his master, but it must pertain to the duties of the

employment. *McKeon v. Railroad*, 42 Mo. 79; *Snyder v. Railroad*, 60 Mo. 413; *Jackson v. Railroad*, 87 Mo. 422; *Farber v. Railroad*, 32 Mo. App. 378. When, therefore, in the case last cited, a common brakeman removed a trespasser from a freight train, and in so doing injured the trespasser, the railroad company was not liable because the brakeman had no authority to remove a trespasser from the train. This principle controls and decides the question in the present case. The second mate no doubt had authority to set the deckhands about their work, and to direct them in the mode of performing their work. It may also be conceded that he had authority to urge them with *words*, so far as necessary to make them active in the discharge of their duties. But no express authority is shown to urge them with *blows*, and no such authority can be implied in law. No authority can be implied on the part of the superior servant or vice-principal, which the master himself does not possess, whether he be a natural person or a corporation. A master possesses no power to resort to blows or to physical violence for the purpose of urging his servants to work. To admit such a principle would be to concede the existence of a state of slavery. Counsel for the plaintiff have cited one or two very old cases, which seem to concede this principle; but we have no hesitation in saying that such is not the common law of Missouri at the present day. The argument, that the relation of master and servant is analogous to the relation of master and apprentice, and that a master has power of personal chastisement over his apprentice, is unsound. The relation of master and servant, when the term is used in the sense of the mere relation of an employer to his adult employe, is but remotely analogous to that of master and apprentice. The latter relation is one of *domestic status*, as well as one of contract. The master stands toward his apprentice *in loco parentis*. The relation is, in this

state, governed by the statute law; and by that law each owes to the other certain duties independently of the contract by which the relation has been assumed. But it is not so with the ordinary relation of employer and employe, although the books inaptly use the ancient words, master and servant, for the purpose of designating the relation. In this case the relation is one of contract merely. Both are adults; both are *sui juris;* neither is a minor; either is at liberty to determine the relation at pleasure, subject only to civil responsibility for a breach of his contract.

Neither is any ground gained in such an argument by quoting admiralty decisions to the effect that the master of a ship has the power of chastisement over a seaman. The relation of master and seaman in the admiralty law is in many respects different from the ordinary relation of employer and employe upon land. The sailor, who ships for a voyage, binds himself to remain in the service until the end of the voyage. On grounds of public policy, and having reference to the safety of life and property at sea, the law does not permit him to determine that relation capriciously, or to abnegate its duties while the period of the contract continues. But the case of a steamboat on the Mississippi river is not the case of a ship at sea. The relation of employer and employe on such a steamboat, at least when it arises in the courts of Missouri, is governed not by the admiralty law, which is administered in the courts of the United States, but by the common and statute law of Missouri. By that law an employer has no power to use force or violence in order to compel his employe to keep his contract,—that is to perform the labor which he has undertaken to do. As the employer himself has no power to use force or violence, the use of force or violence by his vice-principal cannot be regarded as within the scope of his employment; for it cannot be intended, in the absence of express evidence, that such

is the fact, that the employer authorizes his vice-princi-
pal to do a thing which he himself has no power to do.
The relation which subsists between employer and
employe, in the case of an ordinary deck-hand upon a
steamboat upon one of our inland rivers, is not essen-
tially different from that which subsists between an
employer and employe, in the case of a brakeman or
other trainmen on a railroad. It is not necessary to say
that, in either case, the master would not be justified,
through his vice-principal, in resorting to force and
violence for the purpose of maintaining discipline and
compelling labor in the case of a fire, a shipwreck, or
other calamity imperiling life or property. We do not
adjudge upon a speculative case, but we merely decide
the case before us.

The case is not one, where the superior servant or
vice-principal had any authority from the general mas-
ter, either express or implied, to use violence under any
circumstances whatever in accomplishing the purposes
of the master. It is, therefore, not like the case where
the railway conductor wrongfully expels the passenger.
Nor was it a case where the master had assumed, by
contract or otherwise, any special duty toward the ser-
vant injured of protecting him from injury on the part
of another servant, such as the duty which the carrier
assumes towards his passenger of transporting him
safely and without harm from one place to another.
The act done to the plaintiff by the superior servant was,
therefore, neither an act done in the scope of his
employment, nor an act done in violation of any special
duty, which the general master has assumed towards
the plaintiff, which duty the immediate actor was
appointed to perform. It stands in law as his mere
wanton and criminal act, for which not another person,
but himself, is liable.

It is worthy of note that, notwithstanding the dili-
gence which counsel for the plaintiff has displayed in

this case, he has not been able to cite to us any case where the master has been held liable to his servant for an assault and battery committed by a superior servant under circumstances like the present. In the multiplicity of judicial decisions in various jurisdictions on the liability of employers, and in view of the hasty manner in which overcrowded courts often do their work, it would, perhaps, be hazardous to say that there is no such reported case ; but we do say that, after an extensive search, we have not been able to find any. We, therefore, hold that the defendant is not liable under the second count, so far as the battery is concerned.

The act of the second mate in compelling him to labor, after his hand had been hurt, rests upon the same principle as his act in committing a battery upon him. The relation between the defendant and the plaintiff being that of contract merely, the plaintiff was not compelled to labor if he did not see fit to do so. He was at liberty to quit the employment subject to the liability of the loss of his wages, and to any liability for damages for the breach of his contract in case of improperly quitting it. If the defendant cannot be held liable for the actual violence which its superior servant committed upon the plaintiff, for equal reasons it cannot be held liable by reason of the act of its superior servant in compelling the plaintiff to labor through fear of committing violence upon him.

In such a case as this our ordinary judgment would be to reverse the judgment of the circuit court, and remand the cause with directions to the circuit court to enter judgment upon the verdict as to the first count, and for the defendant as to the second count notwithstanding the verdict. But as the plaintiff's right of recovery on the first count even is doubtful under the evidence, and as the verdict on the first count may have been influenced by the evidence received under the

second count, we have concluded that the evidence which was introduced under the second count may have been prejudicial to the defendant in respect of the first count, and that the ends of justice will be best subserved by ordering a new trial. The judgment will be accordingly reversed and the cause remanded with directions to grant a new trial. It is so ordered. All the judges concur.

ON MOTION FOR REHEARING.

ROMBAUER, P. J.—In view of an able and earnest argument made by the plaintiff's counsel in moving for a rehearing of this cause, we have re-examined the questions involved in the second count of the petition. We concede that the language used by some of the judges is broad enough to warrant an action of that character, but we must repeat that no adjudged case has been found and that certainly none has been cited to us, where a master has been held liable for the acts of a superior servant in beating a subordinate for the purpose of making him work, even though the battery was for the admitted purpose of furthering the master's business.

We have not held, as counsel assumes, that a master may not be held liable for a battery committed by his servant under some circumstances, nor have we held that there is a difference in that regard between the servant of an individual and the servant of a corporation. The proposition that a master may be held thus liable, whether an individual or a corporation, is too well settled to be questioned, and while some cases doubt the liability of the master where the battery is wilful and malicious, there are well-reasoned cases which hold the master liable even in the latter event. On the other hand no case can be found, which places the liability on the ground that the servant is supposed to

act under the compulsion of the master, on which the liability of the husband for the battery inflicted by his wife rests, and, therefore, no case lays down the general proposition that a master is liable for a battery or any other wrong, committed by the servant, simply because the servant committed the wrong in an endeavor to forward his master's business.

The proper limitation, recognized in all the cases, is that the wrong done must be *within the scope of the servant's employment.* Where the authority given to the servant implies the use of force, the master is always responsible for the excess of force used. This is the rule in many cases, even though the excess of force used is wilful. The master, having authorized the servant to use force, is liable for its abuse. It is that principle which upholds the liability in cases of collision and kindred cases. The case of *Levi v. Brooks*, 121 Mass. 501, which is the strongest case cited by plaintiff's counsel is strictly within the limit, because there, the servant being intrusted with the seizure of goods, was impliedly authorized to use force in case of resistance. No other safe rule can possibly be adopted without making the master an insurer of his servant's conduct to all fellow-servants and third parties on the theory, that the master is responsible for his acts simply because they were done in the supposed interest of the master. Applying the test above stated we are bound to adhere to our original opinion, that the direction by one servant of others in doing the master's work where all are freemen cannot imply the use of force, and hence the use of force in making his subordinates work is not within the scope of the superior servant's employment.

All the judges concurring, the motion for rehearing is overruled.